**INDIANA INSURANCE COMPANY, Appellee,**

v.

**CARNEGIE CONSTRUCTION, INC., Appellant.**

[Cite as *Indiana Ins. Co. v. Carnegie Constr., Inc.* (1995), 104 Ohio App.3d 219.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 94–CA–6

Decided May 31, 1995.

*Stephan D. Madden,* for appellee.

*Freund, Freeze & Arnold, Stephen V. Freeze* and *Lisa A. Hesse,* for appellant.

FREDERICK N. YOUNG, Judge.

Carnegie Construction Company ("Carnegie") appeals from an order entered on a counterclaim for declaratory judgment it brought against the Indiana Insurance Company ("Indiana"). Indiana initiated this action by bringing subrogated claims against Carnegie alleging negligence and breach of contract in the construction of a school building for the West Liberty–Salem Board of Education ("the Board"). Carnegie responded by seeking a declaration that Indiana could not bring a subrogated claim against it because it was an insured of Indiana, or alternatively, because the Board and Carnegie agreed to make Carnegie an insured of Indiana. The trial court denied Carnegie the declaration it sought, holding that neither the insurance policy the Board purchased from Indiana, nor the construction contract between the Board and Carnegie, operated to bar Indiana from bringing its subrogated claims, because "Indiana Insurance Company is not an insurer of Defendant, Carnegie Construction Co., Inc."

In May 1987, Carnegie and the Board contracted for the construction of a new school building on State Route 68, in Urbana, Ohio. Under the General Conditions of the construction contract, Carnegie was "responsible for * * * [t]he safety and good condition of all work and materials embraced in or affected by [its] contract, until the completion of [its] contract as an entirety." Instructions to Bidders and General Conditions, Article 18(a)(2). To this end, Carnegie agreed to "be responsible for all precautions as may be necessary to fully protect

[its] work both during its execution and until its final acceptance, in default of which [Carnegie would] be held responsible for all damage incurred." *Id.*, Article 18(b).

Following this language is an additional provision requiring both Carnegie and the Board to obtain insurance for the project. Carnegie agreed to "maintain insurance to protect [it] and the Owner from claims for personal injury, direct or derivative, including death, or claims for property damage, resulting from operations under this contract, by [it]self, [its] subcontractor, or anyone directly or indirectly employed by them." *Id.*, Article 18(j)(a)(1). The Board agreed to procure a builder's risk policy to protect "the State of Ohio, the Contractor, and the West Liberty–Salem Local School District Board of Education from loss incurred by theft, fire, lightning, extended coverage, vandalism, and malicious mischief in the full amount of the contract." *Id.*, Article 18(j)(b)(1). Indiana provided a builder's risk policy for the Board; Westfield Insurance Company provided Carnegie with liability insurance. The Board presented Carnegie with a certificate of insurance to evidence builder's risk coverage, as the construction contract required, and work commenced.

By December 1987, the erection of masonry walls was underway. On December 15, they were toppled by gale force winds. The Board promptly made a claim for the loss under the Indiana builder's risk policy. After conducting some investigation, Indiana agreed that the cause of the loss was the December 15 windstorm, and because the project was property insured, and windstorm a peril insured against in the builder's risk policy, Indiana paid the Board $279,668.36.

Indiana subsequently continued its investigation into the cause of the loss, and concluded that Carnegie's failure to properly protect its work by bracing the walls while they were under construction left the walls vulnerable to damage from high winds. Indiana then filed suit against Carnegie, asserting that it was subrogated to the Board's potential claims against Carnegie for negligence and breach of contract.

In its answer, Carnegie raised its own relationship to Indiana as an affirmative defense to the action, averring that an insurance company cannot bring a subrogated claim against its intended insured. The trial court, in the first part of a bifurcated trial, determined that Carnegie was not an insured party under the builder's risk policy the Board had with Indiana, and that Indiana could therefore sue Carnegie.

Carnegie immediately appealed from this adverse judgment. We dismissed that appeal as premature in *Indiana Ins. Co. v. Carnegie Constr., Inc.* (1993), 91 Ohio App.3d 286, 632 N.E.2d 579, holding that although the court's determination of this threshold issue might in fact represent an independent judicial inquiry, it was not entered in a special proceeding as defined in *Polikoff v. Adam* (1993), 67

Ohio St.3d 100, 616 N.E.2d 213, and therefore did not meet the finality requirements of R.C. 2505.02.

The trial court remedies this deficiency by permitting Carnegie to amend its answer to include a counterclaim for declaratory judgment on the insurance coverage issue. A declaratory judgment is a special proceeding. *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.* (1989), 44 Ohio St.3d 17, 22, 540 N.E.2d 266, 271–272. The court then issued the same judgment it had issued before, adding a Civ.R. 54(B) certification that there is no just reason to delay an appeal. A resolution of this issue may obviate trial on the pending claims for negligence and breach of contract. Accordingly, we agree with the trial court that an immediate appeal will serve the interests of sound judicial administration at the trial court level. *Wisintainer v. Elcen Power Strut Co.* (1993), 67 Ohio St.3d 352, 355, 617 N.E.2d 1136, 1138–1139; *Hausman v. Dayton* (Dec. 22, 1993), Montgomery App. No. 13647, unreported, 1993 WL 541649. We conclude that this matter is ripe for review.

Carnegie assigns one error:

"The trial court erred in finding Indiana Insurance Company has a right of subrogation against Carnegie Construction, Inc. for recovery of damages paid to West Liberty–Salem Local School District Board of Education."

This assignment raises two arguments: that no right of subrogation exists against Carnegie because Carnegie is an insured of Indiana, or alternatively, that no right of subrogation exists because the Board contractually waived its right to seek recovery from Carnegie for certain kinds of damage to the project. We find the latter argument dispositive of the matter, and so discuss it first.

Indiana premised its subrogated claims against Carnegie on Carnegie's alleged failure to brace or to otherwise shore up the masonry walls to make them good against high winds, which, it alleges, was both negligence and a breach of the construction contract between Carnegie and the Board. Carnegie contends that these claims cannot be brought, because the Board and Carnegie contractually agreed to insure themselves from any loss arising from windstorm damage, even if that loss was facilitated by the negligence of one or the other of them. Carnegie argues that because the Board could not bring such claims against Carnegie in its own right, Indiana, whose rights cannot be superior to those of the Board, also cannot bring them. We agree.

The interpretation of a written agreement is a matter of law for the court, and need not be submitted to a finder of fact unless the terms of the written agreement are ambiguous. *Calton v. CV Radio Assoc., L.P.* (1994), 93 Ohio App.3d 812, 815, 639 N.E.2d 1249, 1250–1251. Moreover, contracts are to be construed so as to give effect to the intent of the parties, and that intent is

presumed as a matter of law to be fully revealed in the language the parties chose to put into the agreement. *Id.*

Carnegie was obligated by the construction contract to deliver a complete school building to the Board by the contract deadline. See Instructions to Bidders and General Conditions, Article 6(h); Article 7; and Article 26. Under the provisions recounted above, if the work was damaged before it was completed, Carnegie was the party responsible for making that loss good. In the later insurance provisions, the Board obligated itself to purchase a builder's risk policy protecting it, the state of Ohio, and Carnegie from damage to the work "incurred by theft, fire, lightning, extended coverage, vandalism, and malicious mischief in the full amount of the contract," and to maintain such insurance until the project was completed. *Id.*, Article 18(j)(b)(1). "Extended coverage" is a term that embraces the risk of loss by windstorm. See *Len Immke Buick v. Architectural Alliance* (1992), 81 Ohio App.3d 459, 464, 611 N.E.2d 399, 402. The policy was to cover "all labor and materials connected with the work, including materials delivered to the site but not yet installed in the building." The Board was required to furnish proof that such insurance had been obtained before Carnegie was required to begin construction. Under these circumstances, the only reasonable conclusion to be drawn from the agreement to insure was that the Board and Carnegie mutually agreed to shift the described risks of loss from Carnegie's shoulders, on which they had been firmly placed by the earlier provisions of Article 18, to those of an insurer, though Carnegie would continue to guarantee the "safety and good condition" of the work in all other respects. See Instructions to Bidders and General Conditions, Articles 18(a)(2) and (b).

It seems that no court in Ohio has yet found a mutual waiver of claims for losses agreed to be insured against in a mere agreement to insure, though the Court of Appeals for Franklin County has twice found mutual waivers in contracts that contained agreements to insure and explicit waiver clauses.[1] The construction contract in the case before us has no explicit waiver provision. Nevertheless, a number of other jurisdictions have found mutual waivers implicit where parties to a construction contract have agreed that one of them would bear the burden of obtaining insurance to protect them all, including the states of Indiana, *LeMaster Steel Erectors v. Reliance Ins. Co.* (Ind.App.1989), 546 N.E.2d

---

1. The contract under examination in *Ins. Co. of N. Am. v. Wells* (1973), 35 Ohio App.2d 173, 175, 64 O.O.2d 274, 276, 300 N.E.2d 460, 462, contained a provision by which "the Owner, Contractor, and all subcontractors waive all rights, each against the others, for damages caused by fire or other perils covered by insurance provided for under the terms of this article." Likewise, in *Len Immke Buick, Inc. v. Architectural Alliance* (1992), 81 Ohio App.3d 459, 463, 611 N.E.2d 399, 401–402, the construction contract provided, "The Owner and Contractor waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this Article."

313, 317, and *Morsches Lumber, Inc. v. Probst* (1979), 180 Ind.App. 202, 388 N.E.2d 284; Georgia, *Tuxedo Plumbing & Co. v. Lie–Nielsen* (1980), 245 Ga. 27, 29, 262 S.E.2d 794, 795–796; Texas, *Tillerson v. Highrabedian* (Tex.Civ.App. 1973), 503 S.W.2d 398, 400; and Nebraska, *Midwest Lumber Co. v. Dwight E. Nelson Constr. Co.* (1972), 188 Neb. 308, 310, 196 N.W.2d 377, 379.

These cases hold that where parties to a construction contract each have an insurable interest in the project to protect, an agreement that one party will maintain insurance on a project necessarily means, to the extent of the insurance agreed to be purchased, that the parties have absolved one another of liability for any insured loss, and instead shifted that risk of loss to an insurer. "With agreements to insure * * * [n]either party intends to assume a potential liability; rather, both are demonstrating 'normal' business foresight in avoiding liability and allocating it to an insurer." *Morsches Lumber, Inc. v. Probst, supra,* 180 Ind.App. at 206, 388 N.E.2d at 287. By "expressly imposing the duty to insure against the loss on one of them [the parties expect] that the other will be protected as fully as if he had assumed the duty himself." *Id.*

The Nebraska Supreme Court examined a construction contract very similar to the one under examination in this case. The owner was required to maintain builder's risk insurance, and the contractor was to purchase public liability insurance. The court noted that the burden of restoring the project in the event of loss ordinarily falls on the contractor, and so both the owner and the contractor had an insurable interest in the project to protect with a builder's risk policy. The owner purchased the required policy, naming only himself as the insured. Just as in this case, when a windstorm blew down framing erected on the project, the builder's risk carrier paid on the owner's claim and sought to sue the contractor for his failure to brace the framing against wind.

The court concluded that "the parties intended to cover the risks of both and therefore the owner cannot recover from the contractor because the risks of both contractor and owner were intended by the parties to the construction contract to be covered by insurance." *Midwest Lumber Co. v. Dwight E. Nelson Constr. Co., supra,* 188 Neb. at 310, 196 N.W.2d at 379. The court reasoned thus: "It is evident that if each was interested only in protecting himself from loss each could have purchased his own insurance and he need not have consulted the other about it. The reason for including a specific provision for 'builder's risk or fire and extended coverage insurance * * * paid for by the Owner' could be only to protect the separate interest of both parties and to determine how the cost thereof was to be paid." *Id.*

Notwithstanding Indiana's assertions to the contrary, the fact that the Board, and not Carnegie, was the party responsible for paying the entire premium for the builder's risk policy does not suggest that Carnegie's interests were not

meant to be covered by it. Carnegie submitted a bid for this project embracing its estimated costs to complete the project, plus a reasonable profit. The cost of a builder's risk premium would have been included with the other costs of construction in a bid to the Board, if Carnegie had been required to pay it. This fact was developed in Mr. Thomas Chatham's testimony at trial.

"Q. And assume, for instance, that the instruction to bidders did not impose upon the owner the obligation of getting the builder's risk but instead imposed it upon Carnegie. Would that show up in any way on the bid that Carnegie then supplies to the owner?

"A. Many times an owner will ask for the cost of the builder's risk in a bid as a line item just as they would the cost of other supplied services or materials.

"Q. Is that a cost that ultimately has to be borne by the owner of the project?

"A. Whether the owner pays for the coverage or the contractor pays for the coverage and incorporates that in his bid to the owner, ultimately it is a cost of the project, yes."

By agreeing to obtain the builder's risk coverage itself, the Board was merely paying directly what it would have to pay indirectly in any event (see, also, *Midwest Lumber, supra,* 188 Neb. at 310, 196 N.W.2d at 379), and could guarantee that it, too, would be protected against any insured loss to the project. This arrangement had the added benefit of allowing the Board to select the insurance carrier it preferred.

We conclude from the construction contract that both Carnegie and the Board intended for the both of them to be fully protected by the builder's risk policy against windstorm loss, without reference to who was to be named as the insured on the policy, or who was to pay the premium. If they did not so intend, there was no reason for them to include an agreement to insure in their construction contract, which was patently meant to vitiate the need for each of them to purchase builder's risk insurance separately.

Further, we are persuaded that the parties intended to be protected against covered losses even if the loss was facilitated by their own negligence. "Individuals understand that insurance will protect them against the consequences of their own negligence and more than likely assume that if one who is a party to a contract agrees as part of his or its duties to provide insurance, that the insurance will protect both of them regardless of the cause of the loss (excepting, of course, wanton and willful acts)." *Morsches Lumber, supra,* 180 Ind.App. at 206, 388 N.E.2d at 287.

Though the fact of coverage under the builder's risk policy purchased from Indiana is not properly at issue in this appeal, we note that the record fully supports the idea that the policy does insure against windstorm damage to the

work, even if that damage was made possible by Carnegie's negligence in failing to make the walls good against high winds.

Thomas Chatham testified it was true that even "if negligence is involved, even if Carnegie was negligent, assuming that, during the construction phase, * * * the builder's risk policy [was] intended to take care of that." Indiana called Thomas Kondas to testify, who was at the time of the windstorm loss one of Indiana's insurance adjusters. Mr. Kondas's testimony fully agreed with Chatham's on this point, as was exhaustively developed in cross-examination.

"Q. So regardless of who was negligent because there was no exclusion under the all-risk policy you had by Indiana, Indiana paid on this loss?

"A. There was no exclusion for this particular type of loss under this policy at that point in time.

"Q. So that if the Board of Education had written down on the proof of loss negligence of Carnegie rather than windstorm, you still would have paid the loss, correct?

"A. We would have paid our insured, yes.

"Q. Indiana would have paid the loss regardless and that is because, you have to answer out loud if you would, please, Indiana would have paid the loss regardless if there was negligence on the proof of loss or windstorm on a proof of loss?

"A. True.

" * * *

"Q. And so in this particular case if there had been a welder on the job while the project was ongoing and a spark from the welding ignited a fire that burned down the project, Indiana would have paid under that situation, too?

"A. Yes, it would have.

" * * *

"Q. And that is because this is what you call a direct loss policy?

"A. True.

"Q. And the direct loss doesn't really look to fault. All it looks to is whether there was an exclusion for this type of event?

"A. That is true.

"Q. Whether there was fault involved or not it doesn't make any difference as long as there is no exclusion?

"A. It does not.

"Q. Okay. And the reason that that is done is because during construction any number of things can happen to damage the project, true?

"A. Absolutely.

"Q. What you're protecting against then is the completion of the project so that it gets complete in case something happens to destroy or damage the project while it's going up?

"A. Essentially, that is true."

What's more to the point for purposes of this appeal, it is reasonable to suppose that the Board and Carnegie intended that the Board would procure just this sort of policy: a policy that insured against the losses described in the agreement to insure, even if those losses were caused by their own negligence.

We conclude that the Board contractually waived its right to pursue Carnegie for the windstorm loss sustained on December 15, 1987, because it agreed to shift the risk of that loss onto an insurer. Indiana, as the Board's subrogee, cannot succeed to rights greater than those possessed by the Board. *Ins. Co. of N. Am., supra,* 35 Ohio App.2d at 177, 64 O.O.2d at 277, 300 N.E.2d at 463; and *Tuxedo Plumbing & Co. v. Lie–Nielsen, supra,* 245 Ga. at 29, 262 S.E.2d at 795–796. As a result, without reference to whether Carnegie is an insured under Indiana's builder's risk policy, no right of subrogation to recover from Carnegie will lie.

Carnegie's sole assignment of error is sustained, and the judgment of the trial court is reversed. Costs to be paid by appellee Indiana Insurance Company.

*Judgment reversed.*

WOLFF and FAIN, JJ., concur.