**2024 IL 130242**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 130242)

ZURICH AMERICAN INSURANCE COMPANY, Appellee, v.
INFRASTRUCTURE ENGINEERING, INC., Appellant.

*Opinion filed September 19, 2024.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

## OPINION

¶ 1      Plaintiff, Zurich American Insurance Company (Zurich), issued a builder's risk insurance policy to insure the construction of an academic building for Community College District No. 508, doing business as City Colleges of Chicago (City Colleges). Defendant, Infrastructure Engineering, Inc. (IEI), a subcontractor on the construction project, was hired to design a system for collecting rainwater. While

the building was under construction, a rainstorm caused the basement of the building to flood, causing significant damage.

¶ 2    Zurich paid a claim for the resulting damages by submitting payment to CMO, a joint venture and general contractor on the project, pursuant to the builder's risk policy. Zurich, claiming the status of subrogee of City Colleges, then sued IEI for breach of contract, alleging IEI's rainwater redesign caused the damage to the building. IEI moved for summary judgment, arguing that Zurich was not entitled to subrogation for City Colleges because it issued payment under the policy to CMO, not City Colleges, and CMO, as general contractor, repaired the physical damages. The Cook County circuit court agreed and entered summary judgment in IEI's favor. Zurich appealed, arguing that the builder's risk policy entitled it to step into City Colleges' shoes pursuant to the policy's subrogation provisions. The appellate court agreed, reversed the circuit court's judgment, and remanded the cause for further proceedings. 2023 IL App (1st) 230147.

¶ 3    We granted IEI's petition for leave to appeal, and for the following reasons, we affirm the appellate court's judgment and reverse the circuit court's judgment.

¶ 4                              BACKGROUND

¶ 5    City Colleges owns and operates Malcolm X College. In planning the construction of the approximately 500,000-square-foot academic building and parking garage for Malcolm X College, City Colleges executed an agreement with CMO as general contractor and an agreement with Moody Nolan, Inc. (Moody Nolan), as architect for the project. The project included the development of the academic building with one or more basement levels to house, among other things, mechanical and electrical equipment.

¶ 6    On April 4, 2013, City Colleges entered into the written contract with Moody Nolan wherein Moody Nolan agreed to provide architectural and engineering services for the project. The contract contemplated that Moody Nolan may subcontract engineering consultants to perform some of the design work, subject to certain conditions. The contract defined "Subcontractor" as any "entity with whom [Moody Nolan] contracts to provide any part of the Services *** including subcontractors and subconsultants of any tier, whether or not in privity with"

Moody Nolan. The Moody Nolan contract stated, in part, "In addition, each subcontract for the performance of the Services must provide that [City Colleges] is a third-party beneficiary to the subcontract, and may enforce any of the subcontract terms including[ ] those pertaining to standard of performance, indemnity and insurance." City Colleges' contract with Moody Nolan did not include a waiver of subrogation provision, wherein, for example, City Colleges waived claims against Moody Nolan or its subcontractors for damages covered by property insurance for the building's construction.

¶ 7   Moody Nolan entered into a written contract with IEI on April 17, 2013, and this written agreement incorporated City Colleges' agreement with Moody Nolan, referring to it as the "Prime Agreement." Moody Nolan subcontracted to IEI the civil engineering work for the project, including the design and specification of the stormwater management systems. The IEI subcontract stated, in part, "Where a provision of the Prime Agreement is inconsistent with a provision of this Agreement, the Prime Agreement shall govern."[1] The IEI subcontract required IEI to maintain general liability, automobile liability, workers' compensation, and professional liability insurance.

¶ 8   On January 8, 2014, City Colleges and CMO entered into an agreement, which listed Moody Nolan as architect of record for the construction of the new academic building. In the agreement, CMO agreed to serve as the general contractor for the construction of the building, providing all necessary labor, material, and equipment to complete the project. This agreement required CMO to warrant that the work conformed to the requirements of the contract documents and was free from defects.

¶ 9   The contract between CMO and City Colleges required CMO to purchase and maintain a builder's risk property insurance policy during the period of construction.[2] Specifically, the contract provided:

---

[1]Because the Prime Agreement between City Colleges and Moody Nolan expressly required City Colleges to be a third-party beneficiary of any subcontracts Moody Nolan entered into with its subcontractors, and the Moody Nolan-IEI subcontract provided that the Prime Agreement governed, the appellate court found that City Colleges was a third-party beneficiary of the Moody Nolan-IEI subcontract. 2023 IL App (1st) 230147, ¶ 54. IEI does not challenge this finding in this court.

[2]A builder's risk policy is first-party property insurance that provides coverage for a building under construction before it becomes insurable as a completed structure. 5 Jeffrey E. Thomas, New

"[CMO] shall purchase and maintain *** property insurance written on a builder's risk 'all-risk' or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract Modifications and cost materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made *** or until no person or entity other than [City Colleges] has an insurable interest in the property required *** to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors[,] and Sub-subcontractors in the Project."

¶ 10   In the January 8, 2014, agreement, City Colleges agreed to pay premiums for that portion of insurance required by the contract. The agreement further specified that City Colleges and CMO "waive all rights against *** each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, for damages caused by fire or other causes of loss to the extent covered by" the builder's risk insurance policy.[3]

¶ 11   In 2014, CMO purchased the builder's risk policy from Zurich to insure the construction of the academic building for the policy period of January 20, 2014, to December 31, 2015. CMO was listed as the "Named Insured" in the policy, and City Colleges, as owner, was listed as an "Additional Named Insured." Specifically, the policy provided that "Additional Named Insured(s)" included

"All owners, all contractors and subcontractors of every tier, and tenants at the project location, except [CMO], as required by any contract, subcontract or oral agreement for the INSURED PROJECT [located at West Jackson Boulevard

---

Appleman on Insurance Law Library Edition § 50.01 (2024). It pays for necessary repairs if the building is physically damaged during construction. *Id.*

[3]A waiver-of-subrogation clause in a construction contract is intended to allow the parties "to exculpate each other from personal liability in the event of property loss or damage to the work occurring during construction, relying instead on the insurance purchased by one of the parties to provide recovery for that loss." *Intergovernmental Risk Management v. O'Donnell, Wicklund, Pigozzi & Peterson Architects, Inc.*, 295 Ill. App. 3d 784, 791 (1998); see *Behr v. Hook*, 787 A.2d 499, 503 (Vt. 2001) (by shifting the risk of loss to the insurance company regardless of fault, clauses seek to avoid prospect of extended litigation that would interfere with construction).

and described as new construction expansion to existing Malcolm X College], and then only as their respective interests may appear are recognized as Additional Named Insureds hereunder. As respects architects, engineers, manufacturers and suppliers, their interest is limited to their site activities only."

¶ 12　　　　Under the policy, CMO was deemed to be the "sole and irrevocable agent" for all the other entities insured thereunder. The policy stated:

"[CMO] shall be deemed the sole and irrevocable agent of each and every Insured hereunder for the purpose of giving and receiving notices to/from [Zurich], giving instruction to or agreeing with [Zurich] as respects Policy alteration, for making or receiving payments of premium or adjustments to premium, and as respects the payment for claims."

¶ 13　　　　The builder's risk policy provided that it "insure[d] against all risks of direct physical loss or damage to Covered Property while at the location of the [insured project] occurring during the Policy Term." The policy further provided:

"Loss, if any, shall be adjusted with and made payable to [CMO] and designated Loss Payees and/or Mortgage Holders *** or as per order of [CMO]. Receipt of payment by [CMO] shall constitute a release in full of all liability under this Policy with respect to such loss."

¶ 14　　　　Section 12 of the builder's risk insurance policy included provisions involving subrogation. Specifically, it stated:

"If [Zurich] pays a claim under this Policy, [it] will be subrogated, to the extent of such payment, to all the Insured's rights of recovery from other persons, organizations and entities. The Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights."

This section of the policy further provided that Zurich "will have no rights of subrogation against *** [a]ny other person or entity, which the Insured has waived its rights of subrogation against in writing before the time of loss." It further

provided that Zurich "will have no rights of subrogation against \*\*\* [a]ny person or entity, which is a Named Insured or an Additional Named Insured."[4]

¶ 15     Even so, section 12 of the builder's risk policy provided as "a condition of th[e] policy" that Zurich

> "shall be subrogated to all the Insured's unwaived rights of recovery, if any, against any third party Architect or Engineer, whether named as an Insured or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by any error, omission, deficiency or act of the third party Architect or Engineer, by any person employed by them or by any others for whose acts they are legally liable."

¶ 16     According to the record on appeal, the stormwater detention system designed by IEI for the new Malcolm X College project relied on underground stormwater detention vaults called "storm traps" to collect and detain water from roofs and other surfaces for gradual conveyance to the city sewer. The original stormwater detention design submitted by IEI included concrete pads underneath the storm trap chambers. However, IEI approved an alternative design for the stormwater detention system that specified a stone base under the storm trap chambers. CMO subcontracted the installation of the stormwater detention system at the project to Reyes Group, Ltd.

¶ 17     On August 17, 2015, before construction of the academic building was complete and the stormwater detention system designed by IEI fully connected, a rainstorm flooded the basement of the academic building, damaging the building itself and its electrical and mechanical equipment. CMO submitted a claim to Zurich for the damage that resulted from the flooding, and CMO paid the deductible. After applying the policy deductible, Zurich made claim payments to CMO totaling almost $3 million, and CMO repaired the damage.

---

[4]Thus, the policy memorialized the antisubrogation principle that "an insurer may not subrogate against its own insured or any person or entity who has the status of a co-insured under the insurance policy." (Internal quotation marks omitted.) See *Sheckler v. Auto-Owners Insurance Co.*, 2022 IL 128012, ¶ 38.

¶ 18                                    Circuit Court

¶ 19          In 2016, Zurich, as subrogee of City Colleges,[5] filed this action against IEI, among others, to recover its claim payments. In count III of its complaint, Zurich alleged that IEI breached its subcontract with Moody Nolan, of which City Colleges was a third-party beneficiary, by designing a defective stormwater management system that caused the loss at the construction site in August 2015. Zurich alleged that City Colleges sustained damages as a direct result and that Zurich paid for the damages sustained by City Colleges. Zurich alleged that it was entitled to stand in the shoes of City Colleges as a result of making the claim payments under the builder's risk policy.

¶ 20          Relevant here, in its second motion for summary judgment filed on July 20, 2022, IEI argued, *inter alia*, that Zurich could not prevail on a breach of contract theory as subrogee of City Colleges because City Colleges sustained no loss and received no loss payments from Zurich pursuant to the policy. IEI argued that, because CMO paid the policy deductible and received payment from Zurich, Zurich could not establish "the third element of a subrogation claim: namely, that it paid City Colleges under the [b]uilder's [r]isk [p]olicy." See *Trogub v. Robinson*, 366 Ill. App. 3d 838, 842 (2006) (third element of subrogation requires insurer to have paid the insured under the policy, thereby extinguishing the debt of the third party).

¶ 21          Zurich responded to the motion for summary judgment, contending that IEI was improperly focusing on whether City Colleges received any claim payments under the policy instead of analyzing the subrogation provision in the policy itself. Zurich contended that, under the unambiguous terms of the policy, it, to the extent of its claim payments, was subrogated to City Colleges' rights of recovery because City Colleges was an insured under the policy. Zurich asserted in supplemental briefing that there was a clear distinction between contractual or conventional subrogation and equitable subrogation and that it was not required to establish the requirements for equitable subrogation because the contracts in the case controlled the issue.

_____

[5]In its complaint, Zurich also sought to recover its payments as subrogee of CMO, but this subrogation claim is not at issue in this appeal.

¶ 22　　　On October 5, 2022, the circuit court granted IEI's motion for summary judgment. In a written order, the circuit court found that Zurich had not shown it was subrogated to City Colleges' rights of recovery. The circuit court held that Zurich "fail[ed] to satisfy the elements of subrogation" because City Colleges sustained no loss. The circuit court found persuasive New York Appellate Division caselaw. See *New York Board of Fire Underwriters v. Trans Urban Construction Co.*, 458 N.Y.S.2d 216 (App. Div. 1983) (insurers had no right of subrogation against the general contractor, which was their own insured, on behalf of owner which ultimately suffered no loss), *aff'd*, 458 N.E.2d 1255 (N.Y. 1983). The circuit court concluded that City Colleges "simply sustained no loss and was not paid by the insurer; two requirements for *** subrogation."

¶ 23　　　Zurich filed a motion to reconsider the circuit court's grant of summary judgment in IEI's favor, arguing that the policy clearly created its right to subrogate on City Colleges' behalf. The circuit court denied Zurich's motion to reconsider, finding that Zurich failed to establish the three elements required for equitable subrogation. See *SwedishAmerican Hospital Ass'n of Rockford v. Illinois State Medical Inter-Insurance Exchange*, 395 Ill. App. 3d 80, 105-06 (2009). Zurich filed its notice of appeal.

¶ 24　　　　　　　　　　　　　　　Appellate Court

¶ 25　　　The appellate court reversed the decision of the circuit court. 2023 IL App (1st) 230147, ¶ 1. The appellate court concluded that the requirements set forth in the builder's risk insurance policy allowed Zurich's right to subrogate on City Colleges' behalf. *Id.*

¶ 26　　　The appellate court noted the three requirements IEI argued must be shown to entitle Zurich to subrogation, namely, (1) a third party must be primarily liable to the insured for the loss, (2) the insurer must be secondarily liable to the insured for the same loss under an insurance policy, and (3) the insurer must have paid the insured under the policy, thereby extinguishing the debt of the third party. *Id.* ¶ 35 (citing *Trogub*, 366 Ill. App. 3d at 842). However, the appellate court held that these requirements do not control a party's right to subrogation when the party meets all the contractual requirements for subrogation in the contractual provisions at issue. *Id.* The appellate court held that "[w]here the right to subrogation is created by an

enforceable subrogation clause in a contract, the contract terms, rather than common law or equitable principles, control." *Id.* ¶ 39. Finding persuasive the federal district court's analysis in *James River Insurance Co. v. Canal Insurance Co.*, 534 F. Supp. 3d 962, 967-69 (N.D. Ill. 2021) (where right of insurer to subrogation is created by enforceable subrogation clause, contract terms control), the appellate court concluded that the circuit court erred when it required Zurich to show compliance with principles outside the contract to enforce its right to subrogation. 2023 IL App (1st) 230147, ¶¶ 38-39.

¶ 27    Addressing IEI's argument that Zurich could not step into City Colleges' shoes because City Colleges did not sustain a loss, claim a loss, or receive payment for a loss, the appellate court held that, as the owner of the property under construction, City Colleges maintained a tangible, insurable interest in the insured property at all times and suffered a loss due to the flooding damage. *Id.* ¶ 45. The appellate court concluded that, according to the unambiguous language of the builder's risk policy at issue, Zurich had the right to be subrogated for City Colleges, as an insured pursuant to the policy, under the circumstances. *Id.* The appellate court therefore reversed the circuit court's entry of summary judgment in IEI's favor. *Id.* ¶ 56.

¶ 28    This court thereafter granted IEI's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021). We also allowed the National Association of Subrogation Professionals to file an *amicus curiae* brief in support of Zurich's arguments on appeal. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 29                                ANALYSIS

¶ 30    For purposes of its subrogation claim against IEI, Zurich asserts, as subrogee of City Colleges, that IEI breached its contract with City Colleges, a third-party beneficiary of IEI and Moody Nolan's contract, by delivering a defective design for the stormwater management system."Under [the] doctrine of subrogation, a person who, pursuant to a legal liability, has paid for a loss or injury resulting from the negligence or wrongful acts of another will be given the rights of the injured person against the wrongdoer." *Dworak v. Tempel*, 17 Ill. 2d 181, 190 (1959). Thus, Zurich, having paid for the claim of loss under the builder's risk policy, seeks to step into the shoes of City Colleges and assert City Colleges' rights against IEI. However, IEI argues that Zurich cannot pursue a subrogation claim as subrogee of

City Colleges because the loss was solely sustained by CMO, another insured under the policy, as evidenced by CMO's handling of the insurance claim and repair of the damage. Accordingly, IEI argues that the circuit court properly entered summary judgment in its favor.

¶ 31      Summary judgment is appropriate "where the pleadings, depositions, admissions and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law." *Schultz v. Illinois Farms Insurance Co.*, 237 Ill. 2d 391, 399 (2010); 735 ILCS 5/2-1005(c) (West 2022). Construction of the terms of an insurance policy is a question of law properly decided on a motion for summary judgment. *Schultz*, 237 Ill. 2d at 399. Although this court may affirm an order granting summary judgment on any basis appearing in the record regardless of whether the circuit court relied on that ground (*Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004)), we may decline to do so where the record is insufficient. We review *de novo* an appeal from an order granting summary judgment. *Seymour v. Collins*, 2015 IL 118432, ¶ 42.

¶ 32      A builder's risk policy covers projects under construction against accidental losses, damages, or destruction of property for which an insured, which may include an owner, contractor, and/or subcontractor, has an insurable interest. See 1 Jordan R. Plitt *et al.*, Couch on Insurance § 1:53 (3d ed. June 2024 Update) ("Builder's risk insurance"); see also 4 Philip L. Bruner & Patrick J. O'Connor Jr., Construction Law § 11:418 (Aug. 2023 Update). Builder's risk policies are intended to shift the risk of loss to the insurer "to facilitate timely completion of the project and avoid the prospect of time-consuming and expensive litigation." *Empress Casino Joliet Corp. v. W.E. O'Neil Construction Co.*, 2016 IL App (1st) 151166, ¶ 71; see *Factory Mutual Insurance Co. v. PERI Formworks Systems, Inc.*, 223 F. Supp. 3d 1133, 1142-43 (D. Or. 2016). The owner and contractor seek to insulate themselves from loss that they might suffer because of damage to a building in the process of construction. Jay M. Zitter, *Insurance: Subrogation of Insurer Compensating Owner or Contractor for Loss Under "Builder's Risk" Policy Against Allegedly Negligent Contractor or Subcontractor*, 22 A.L.R.4th 701, § 2 (1983); see generally *Indiana Insurance Co. v. Carnegie Construction, Inc.*, 661 N.E.2d 776, 780 (Ohio Ct. App. 1995) (the burden of restoring construction project in the event

of loss ordinarily falls on contractor, and so both the owner and contractor have interest in the project to protect with a builder's risk policy); *Midwest Lumber Co. v. Dwight E. Nelson Construction Co.*, 196 N.W.2d 377, 379 (Neb. 1972) (parties intended that risks of both contractor and owner to the construction contract be covered by builder's risk insurance). Builder's risk policies often cover damage to the structure itself and damage to construction materials on the ground upon which work has begun. 22 A.L.R.4th 701, § 2 (1983). These policies ordinarily terminate when construction is complete. *Id.*

¶ 33     As noted, subrogation simply means substitution of one person for another regarding a legal claim or right (Black's Law Dictionary 1726 (11th ed. 2019); *Sheckler v. Auto-Owners Insurance Co.*, 2022 IL 128012, ¶ 39); "that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant" (1 Dan B. Dobbs, Law of Remedies § 4.3(4), at 604 (2d ed. 1993)). "Factually, the case arises because, for some justifiable reason, [a party] has paid a debt owed by the defendant." *Id.* "Having paid the defendant's creditor, the [party] stands in the creditor's shoes *** and 'is entitled to exercise all the remedies which the creditor possessed' against the defendant." *Id.* (quoting *American Surety Co. of New York v. Bethlehem National Bank of Bethlehem*, 314 U.S. 314, 317 (1941)). "Thus, a subrogee merely succeeds to the legal rights or claims of a subrogor." 73 Am. Jur. 2d *Subrogation* § 1, at 542 (2001).

¶ 34     The right of subrogation originated in equity, wherein the courts sought to achieve substantial justice by placing responsibility for a loss upon the one against whom in good conscience it ought to fall. *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319 (1991). Nevertheless, subrogation rights may arise from contract, where they are expressly provided for in an insurance policy or other instrument, or equity, where they are implied to have been intended where necessary to avoid an inequitable and unfair result. *Schultz v. Gotlund*, 138 Ill. 2d 171, 173 (1990). "When put into [an insurance] context, subrogation is defined as '[t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy.' " *Sheckler*, 2022 IL 128012, ¶ 39 (quoting Black's Law Dictionary 1726 (11th ed. 2019)).

¶ 35    "An insurance policy, like any contract, is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). To ascertain the parties' intent and the meaning of the insurance policy's words, the court considers the circumstances surrounding its issuance, such as the type of insurance purchased, the nature of the risks involved, the subject matter insured, and the purpose for which the policy was obtained. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993).

¶ 36    If the insurance policy's words are plain and unambiguous, the court will afford them their plain, ordinary meaning and apply them as written. *Central Illinois Light Co.*, 213 Ill. 2d at 153; *Crum & Forster Managers Corp.*, 156 Ill. 2d at 391. "However, if the words used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter." *Central Illinois Light Co.*, 213 Ill. 2d at 153.

¶ 37    Accordingly, where the insurer's right to subrogation is expressly provided for in an insurance policy and the subrogation clause in the policy is plain, unambiguous, and enforceable, the insurer's right is primarily measured by the policy's provisions. See 16 Couch on Insurance § 222:23 (3d ed. June 2024 Update). In this case, section 12 of the builder's risk policy provides as follows:

    "If [Zurich] pays a claim under this [p]olicy, [it] will be subrogated, to the extent of such payment, to all the Insured's rights of recovery from other persons, organizations and entities. The Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

    [Zurich] will have no rights of subrogation against:

    A. Any person or entity, which is a Named Insured or an Additional Named Insured;

    B. Any other person or entity, which the Insured has waived its rights of subrogation against in writing before the time of loss;

    It is a condition of this Policy that [Zurich] shall be subrogated to all the Insured's unwaived rights of recovery, if any, against any third party Architect

- 12 -

or Engineer, whether named as an Insured or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by any error, omission, deficiency or act of the third party Architect or Engineer, by any person employed by them or by any others for whose acts they are legally liable."

¶ 38 IEI concedes that City Colleges is an "insured" under the builder's risk policy and that the policy does not limit Zurich's subrogation rights to CMO merely because CMO is the first named insured. IEI argues that the foregoing subrogation provision does not provide Zurich with the right to subrogation on behalf of City Colleges because CMO sustained the loss and claimed payment under the insurance policy. IEI argues that the parties' intention in this regard is manifested in the first sentence of section 12, which limits Zurich's right of subrogation "to the extent of such payment" and only to "the Insured's rights of recovery." IEI argues that section 12 uses the definite article "the" and the singular "Insured" to manifest the parties' intention that Zurich is only entitled to subrogation on behalf of a single insured's rights of recovery and that single insured was CMO, the insured who sustained the loss, submitted the insurance claim, and received the insurance payment from Zurich.

¶ 39 We disagree with IEI's premise that City Colleges, indisputably an insured under the builder's risk policy, did not sustain a loss that was indemnified by Zurich pursuant to the builder's risk policy. We are bound to construe the insurance policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. See *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006). As noted by the appellate court below, in construction cases, the owner and the contractor have an insurable interest in the property under construction. 2023 IL App (1st) 230147, ¶ 45; see *Intergovernmental Risk Management v. O'Donnell, Wicklund, Pigozzi & Peterson Architects, Inc.*, 295 Ill. App. 3d 784, 791 (1998). Thus, City Colleges, as owner of the academic building under construction, maintained an insurable interest in the construction of its academic building and in replacing or rebuilding any of its building that sustained physical damage during the construction process. See 5 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 41.05 (2024) (entity has an insurable interest in property if it stands to gain advantage by its continued existence or stands to suffer disadvantage by its destruction).

¶ 40 Section 12, taken with the builder's risk policy declarations and ensuing provisions, reveals that City Colleges was considered an additional named insured under the policy and that physical damage to City Colleges' building during construction was considered a loss. Thus, when City Colleges' academic building was physically damaged by water during its construction in 2015, City Colleges sustained a financial loss, in that the value of its building and equipment diminished because of its damaged state.

¶ 41 City Colleges had protected its insurable interest in its property with a builder's risk policy that afforded coverage for the building under construction. See 11 Couch on Insurance § 155:42 (3d ed. June 2024 Update) (builder's risk insurance protects the property owner, the contractor, and others with an interest in the project against certain risks of loss to the construction project). Pursuant to the clear language of the policy, CMO was deemed City Colleges' agent, and through its agent, City Colleges received policy proceeds to repair its damaged property, and with the proceeds, CMO repaired the property.

¶ 42 IEI argues that CMO did not act as City Colleges' agent when it submitted the claim under the builder's risk policy and received payment for the damage resulting from the August 2015 flood event. However, the builder's risk policy itself states that CMO "shall be deemed the sole and irrevocable agent of each and every Insured hereunder for the purpose of" receiving payment for claims. IEI argues, then, that the contractual language in the policy does not mean what it says. We decline to so hold. See *Schultz*, 237 Ill. 2d at 400 (clear and unambiguous insurance policy terms must be enforced as written unless against public policy).

¶ 43 In support of its argument that even though City Colleges had an insurable interest in the damaged property, it did not sustain a loss, IEI cites *State Farm Mutual Automobile Insurance Co. v. Rodriguez*, 2013 IL App (1st) 121388, ¶¶ 12-14, 30 (court held that insureds sustained no insurable loss under automobile insurance policy because policy did not provide coverage for the seizure of previously stolen vehicles), and *Beman v. Springfield Fire & Marine Insurance Co.*, 303 Ill. App. 554, 555, 562 (1940) (court held that plaintiffs sustained no loss because, when property was damaged by fire and repaired, and reimbursement funds received, plaintiffs did not own the property and had not yet exercised their option to repurchase the property). These cases are easily distinguishable, however.

In this case, unlike *Rodriguez*, the loss was clearly covered by the provisions of the builder's risk policy, and the insurer paid accordingly. Here, unlike *Beman*, City Colleges owned the property at the time of the flood and, thus, suffered a loss when its property was damaged.

¶ 44       In arguing that subrogation is prohibited because City Colleges was not compensated by its insurer for the loss, IEI raises the application of three subrogation elements found in the appellate court case of *Trogub*, 366 Ill. App. 3d at 842, namely (1) a third party is primarily liable to the insured for the loss, (2) the insurer is secondarily liable to the insured for the loss under an insurance policy, and (3) the insurer paid the insured under that policy, thereby extinguishing the debt of the third party. IEI argues that Zurich did not establish the third element because Zurich issued its claim payments to the general contractor, CMO, rather than City Colleges, as owner. Zurich counters that these elements are limited to equitable subrogation, instead of contractual subrogation, and therefore are inapplicable.

¶ 45       Even though these elements have been recited in the context of equitable subrogation, a contractual subrogation provision does not alter the basic requirements of subrogation, including that an insurer must pay its insured before it may maintain suit, in its insured's shoes, against an alleged wrongdoer primarily liable to the insured for a loss. See *Dix Mutual Insurance Co.*, 149 Ill. 2d at 319; see also *James River Insurance Co.*, 534 F. Supp. 3d at 969 (contractual subrogation provision does not alter basic requirement that insurer must first pay insured before maintaining suit against alleged tortfeasor for indemnity (citing *Johnson v. State Farm Fire & Casualty Co.*, 151 Ill. App. 3d 672, 675 (1987))). These recitations are not rigid elements only applicable to equitable subrogation because they involve the definition of subrogation itself. See *Dworak*, 17 Ill. 2d at 190 ("Under this doctrine of subrogation, a person who, pursuant to a legal liability, has paid for a loss or injury resulting from the negligence or wrongful acts of another will be given the rights of the injured person against the wrongdoer."). Even so, the elements are met here. IEI allegedly damaged City Colleges' property through breach of the contract and, thus, is allegedly primarily liable to City Colleges. Zurich was secondarily liable to City Colleges, an insured who suffered a loss under its builder's risk policy, and paid the repair costs for the loss sustained, thereby extinguishing IEI's alleged debt to City Colleges. We are persuaded by Zurich's assertion that, to the extent that IEI contends City Colleges sustained no financial

loss here, because Zurich covered the cost of necessary repairs, IEI ignores the fact that on the day after the flooding incident, City Colleges, an insured under a builder's risk policy, was the owner of a damaged building in need of extensive repairs.

¶ 46    Both City Colleges and CMO sustained a loss compensated by Zurich, from the claim submitted by CMO, as agent, pursuant to the builder's risk insurance policy's language. Nonetheless, IEI maintains that City Colleges did not sustain a loss, stating that its argument turns on who had the underlying contractual responsibility for repairing the damage. IEI explains that City Colleges did not sustain a loss as a result of the August 17, 2015, flood because the Malcolm X College project was still under construction at the time and the deadline for CMO to furnish a substantially completed project had not yet arrived. In support of its argument, IEI cites *Trans Urban Construction Co.*, 458 N.Y.S.2d at 217.

¶ 47    In *Trans Urban Construction Co.*, 458 N.Y.S.2d at 217, the builder's risk insurers, as subrogees of the State of New York (the owner), sought to recover against the general contractor and subcontractors after a windstorm loss during construction of the owner's office building. The contract between the owner and the general contractor stated that the " '[c]ontractor shall bear all such risk of loss or damage until all of the work *** has been finally accepted' " by the owner and required the general contractor to repair damage occasioned during the construction of the project. *Id.* The owner acquired all-risk insurance, naming the general contractor as an additional insured. *Id.* at 218. Subsequent to windstorm damage, the general contractor fulfilled its contractual obligation and made the necessary repairs and thereby submitted claims to the insurers. *Id.* The insurers issued checks payable to both the owner and the general contractor. *Id.* The owner transmitted full payment to the general contractor. *Id.* The insurers thereafter filed an action against the general contractor for the loss, contending that it was entitled to subrogation for the owner's rights against the general contractor. *Id.* The general contractor moved for summary judgment, arguing that no right of subrogation existed because the owner suffered no loss, in that the general contractor had fully assumed the risk of loss and then repaired all the damage to the building following the loss event. *Id.* The circuit court denied its motion for summary judgment dismissing the complaint. *Id.* at 217.

¶ 48    Citing the well-established antisubrogation principle of insurance law, that there is no right of subrogation in favor of the insurer against its own insured or a party named as an additional insured in the policy,[6] the New York Appellate Division held that the insurers may not be subrogated as against their own named additional insured on the policy (the general contractor) after they paid a claim submitted by the insured. *Id.* at 220 ("no right of subrogation exists in favor of the insurer as against [the general contractor], its own insured"). The appellate division reversed the denial of motion for summary judgment as against the general contractor and directed a severance as to the remaining contractor, subcontractors, and architect. *Id.* at 221.

¶ 49    Initially, we note that *Trans Urban* is a decision of a foreign jurisdiction and decisions of foreign jurisdictions are not binding upon this court. *City of Chicago v. Groffman*, 68 Ill. 2d 112, 118 (1971). Even so, *Trans Urban* is distinguishable in that IEI did not fully assume all risk of loss regarding the construction of City Colleges' academic building and then make repairs pursuant to its obligation and the insurance proceeds. Here, the insurer seeks to step into the shoes of the owner, to file an action against a subcontractor, not the general contractor, which in *Trans Urban* had assumed the risk of loss and was required under the contract to repair all damages.

¶ 50    Moreover, unlike *Trans Urban*, IEI, neither in its motion for summary judgment below nor on appeal, has argued that Zurich's subrogation claim against it is barred by antisubrogation principles (see 2 Allan D. Windt, Insurance Claims and Disputes: Representation of Insurance Companies and Insureds § 10:7 (6th ed. Mar. 2024 Update) (antisubrogation rule "is intended to prevent an insurer from recovering back from its insured that loss or damage the risk of which the insured had passed along to the insurer under the policy") on the basis that IEI is an additional insured under the "subcontractor of every tier" language in the builder's risk policy. See *Chubb Insurance Co. v. DeChambre*, 349 Ill. App. 3d 56, 58 (2004) (antisubrogation doctrine precluded insurer's subrogation claim against subcontractor where builder's risk policy naming "additional named insured" as

---

[6]Likewise, in Illinois, "[i]t is well settled that an insurer may not subrogate against its own insured or any person or entity who has the status of a co-insured under the insurance policy." *Dix Mutual Insurance Co.*, 149 Ill. 2d at 323.

" 'contractors and subcontractors of any [*sic*] all tiers' " meant subcontractor was an additional insured under the policy, conflict of interest would arise if insurer had incentive to pursue its own insured for a risk covered in the policy and for which subcontractor paid premium, if perhaps indirectly, and loss should fall on insurer pursuant to policy and not general contractor and subcontractor insured for the same risks under the policy); see, *e.g.*, *1700 Lincoln Ltd. v. Denver Marble & Tile Co.*, 741 P.2d 1270, 1271 (Colo. Ct. App. 1987) (builder's risk insurer of an owner-builder prohibited from subrogating against a negligent coinsured subcontractor for damage incurred during construction of the owner's building); *Baugh-Belarde Construction Co. v. College Utilities Corp.*, 561 P.2d 1211, 1213 (Alaska 1977) (pursuant to antisubrogation principles, subcontractors insured " 'only as regards (their) property' " and " 'as their interests may appear' " were nevertheless insureds preventing them from being liable in subrogation claims for property not their own). But see *Western Washington Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 7 P.3d 861, 869-70 (Wash. Ct. App. 2000) (courts are split on the extent to which "co-insured" status insulates a negligent contractor or subcontractor from liability). IEI also has not asserted that the subrogation language in the policy or contracts is ambiguous. See generally *Certain Underwriters at Lloyd's, London v. Sunbelt Rentals, Inc.*, 790 Fed. App'x 723 (6th Cir. 2019) (court prohibited insurer's subrogation claim against its insured subcontractor, resolving builder's risk policy's ambiguity against insurer).

¶ 51       Instead, IEI argued, and the circuit court improperly agreed, that Zurich could not step into City Colleges' shoes for two reasons: (1) City Colleges sustained no loss, even though its building suffered physical damage constituting a loss under the insurance policy wherein it was an insured, and (2) City Colleges was not compensated for its loss by its insurer, even though City Colleges' agent under clear terms of the policy accepted claim payments from Zurich on City Colleges' behalf. Although this court may affirm the circuit court on any basis in the record, IEI has not developed alternative bases to do so. See *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56 ("a reviewing court is not simply a depository into which a party may dump the burden of argument and research").

¶ 52       In sum, we hold here that the circuit court erred in entering summary judgment in favor of IEI on the basis that City Colleges did not suffer a loss and was not

compensated by Zurich for its loss. As an insured and owner of an academic building damaged while under construction, City Colleges suffered a loss and, pursuant to the builder's risk insurance policy, was compensated for its damages by the insurer, Zurich, through its agent, CMO, who handled the claim pursuant to its obligations under the policy and subsequently made the repairs. None of these facts or provisions precluded Zurich's subrogation action against IEI. Accordingly, we affirm the appellate court's judgment, reverse the circuit court's order entering summary judgment in IEI's favor, and remand for further proceedings.

¶ 53                                              CONCLUSION

¶ 54        For the foregoing reasons, we affirm the appellate court's judgment finding that the circuit court erred in entering summary judgment in favor of IEI. We reverse the circuit court's judgment and remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 55        Appellate court judgment affirmed.

¶ 56        Circuit court judgment reversed.

¶ 57        Cause remanded.